IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 19, 2025

**STATE OF TENNESSEE v. RAY GENE ELLIOTT, III**

**Appeal from the Criminal Court for Knox County**
**No. 120010   Steven Wayne Sword, Judge**

_____

**No. E2025-00113-CCA-R3-CD**

_____

The Defendant, Ray Gene Elliott, III, was convicted by a Knox County Criminal Court jury of three counts of rape, three counts of statutory rape by an authority figure, three counts of aggravated sexual battery, one count of attempted aggravated sexual battery, and one count of sexual activity involving a minor, and was sentenced by the trial court to an effective term of thirty years at 100% in the Tennessee Department of Correction.  The sole issue the Defendant raises on appeal is whether the evidence is sufficient to sustain his convictions.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

George Edward S. Pettigrew, (on appeal and at trial), Knoxville, Tennessee, for the appellant, Ray Gene Elliott, III.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Charme P. Allen, District Attorney General; and Franklin Ammons and Heather Good, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises out of the Defendant's sexual abuse of his biological daughter, H.E., and of his stepdaughter, N.O.[1]  On January 13, 2021, fourteen-year-old H.E. ran away from

_____

[1]  Consistent with the policy of this court, we refer to the minor victims by their initials only.

home to a neighbor's house, where she disclosed the abuse to the neighbor. When police officers brought H.E. home, H.E. also disclosed the abuse to her mother. In subsequent interviews at a child advocacy center, H.E. and her twelve-year-old half-sister, N.O., each made separate disclosures of sexual abuse by the Defendant. The Knox County Grand Jury returned an indictment charging the Defendant with three counts of the rape of H.E., three counts of the statutory rape of H.E. by an authority figure, three counts of the aggravated sexual battery of H.E., one count of the attempted aggravated sexual battery of N.O., one count of sexual activity involving a minor (H.E.), and three counts of incest of H.E. However, the State nolle prosequied the incest counts prior to trial.

## FACTS

At the August 5-8, 2024 trial, seventeen-year-old H.E. testified as follows: She had six brothers and one sister, was the oldest, and lived in a house in Knoxville with her mother and her siblings. The Defendant, her father, lived with the family until January 2021. In January 2021, H.E. was fourteen, in either the sixth or seventh grade, and was attending school online due to the Covid pandemic.

Sometime around January 12, 2021, H.E. was grounded for talking over the internet to a boy in the same grade and sending him a photograph of her naked breasts. Her punishment was to stay in her bedroom and not to have any "electronics." On January 13, 2021, H.E. was on her bed in the bedroom she shared with her sister, N.O., who was asleep in N.O.'s bed on the other side of their bedroom. During the time that H.E.'s mother was gone to the store, the Defendant twice came into the bedroom to scold H.E. about the photograph she had sent to the boy.

When the Defendant walked in the bedroom for the third time, he asked H.E. if she liked "those things" that she was sending the boy, and that the boy was sending her. She told the Defendant that she did not, and that she did not want to talk to the Defendant about it. The Defendant walked out of the bedroom but walked back in and asked her if she had ever seen a penis. Referring to his penis as "it," the Defendant asked if she "liked it and if [she] wanted to do things with it[,]" and if she "wanted to know what it felt like to touch a penis." She told him she did not and that she wanted to go to sleep and be left alone.

The Defendant persisted, telling her that "if [she] sent images like that and [she] got them back, then [she] wanted to see it and [she] wanted to feel it." She again told the Defendant that she did not. At that point, the Defendant pulled his penis out of his pants and told her to touch it. She told the Defendant she did not want to and backed away from his penis. The Defendant then placed her hand on his penis and asked if she liked it, and she said no.

- 2 -

The Defendant put his penis away and left when it sounded as if H.E.'s brothers were approaching the bedroom.  However, the Defendant came back into her bedroom and asked, "Is it wrong that I liked that?" She told him, "Yes."  The Defendant pulled his penis out again and asked H.E. if she "wanted to suck it."  She told him "no and [she] wanted to be left alone and [she] didn't want him in [her] room anymore."  The Defendant told her it was "okay[,]" that she "could do it" and he would not say anything to H.E.'s mother or anyone.  She again told him no but the Defendant "took [her] head and he put [his penis] in [her] mouth."  One of the Defendant's hands was on the wall, and his other hand was on the back of her head.  The Defendant moved her head with his hand and something with a "weird texture" that tasted "salty" came out of his penis.  At the time of trial, H.E. understood what it was, but at the time of the incident, she was confused.  At one point, the Defendant lowered his hand from the wall and began "rubbing over [H.E.'s] vagina (sic)" on the outside of her clothes.  When she started to move away and to tell him to stop, he put his hands inside her pants but did not penetrate her vagina.

After the Defendant did the above, he instructed her to go to the bathroom.  The Defendant walked behind her into the bathroom, shut and locked the door, and told her to sit on the toilet.  The Defendant asked if she liked what she did in the bedroom, and she told him no.  The Defendant then asked if she wanted him to do the same thing to her that she had just done to him.  She told him no and that she wanted to leave the bathroom, but the Defendant would not let her.  The Defendant next pulled her pants and underwear down and began licking her vagina.  The Defendant also put his fingers inside her vagina, which hurt her.  The Defendant finally stopped when he received a notification from the "Life 360" application on his cell phone that H.E.'s mother was about to arrive home.  Before walking out of the bathroom, the Defendant told her not to say anything to her mother about what had happened, that it could remain between the Defendant and H.E., and that H.E. was no longer in trouble with the Defendant.

H.E. was afraid to tell her mother what had happened because the Defendant "hit [her mother] a lot" and she was afraid the Defendant would hit her mother if she told.  Later that evening, H.E.'s mother and the Defendant were arguing with each other and with H.E. about H.E.'s internet communications with the boy, with H.E.'s mother expressing her frustration that the Defendant was leaving "all the parenting" up to H.E.'s mother.  During that argument, H.E.'s mother screamed, "Get out."  H.E. did not know if the words were directed at her, but H.E. took the opportunity to walk out of the house and to run down the road to a neighbor's house, where she told the neighbor that her father had just sexually assaulted her and asked the neighbor to call the police.

When the police responded, H.E. told the officer that she had been sexually assaulted and did not want to go back home, but the officer said he had to take her home

- 3 -

so that her mother would know she was safe.  H.E. told her mother about the sexual assault after the police officer took H.E. home.  That same night, the Defendant left the home.

The January 13, 2021 incidents were not the first time that the Defendant had touched H.E. inappropriately.  The first time it happened, H.E.'s mother was at her night manager's job at a Wendy's restaurant.  The Defendant was lying on the couch but moved his legs so that H.E. could sit on the couch to play a game on PlayStation.  After about ten minutes, the Defendant "slid his foot back down" and began rubbing his foot "up against [her] vagina (sic) back and forth."  H.E. reacted by turning off the game, getting up, and going to her bedroom.

On another occasion, also while her mother was at work at Wendy's, H.E. awoke to find the Defendant standing behind her with "his fingers . . . going from [her] butt to [her] vagina (sic) [over her clothes] back and forth."

On yet another occasion, which H.E. believed occurred pre-pandemic, the Defendant "put porn on over from his phone to the TV" where H.E. and her siblings could see it.  While the pornography was playing, the Defendant "was just staring at [H.E.] and [N.O.]"  H.E.'s reaction was to make sure that she and N.O. went to their bedroom and that their brothers stayed in the brothers' bedroom.

H.E. identified the panties she had been wearing on January 13, 2021, which the police collected into evidence a few days afterward.  She said she had placed the panties in the laundry basket in her bedroom.  The Defendant kept his laundry separate from the rest of the family's laundry because the Defendant worked around peanut oil, and one of H.E.'s brothers had "a deadly allergy to peanuts."  The Defendant never did the laundry and was not in the home after January 13, 2021.  H.E. did not talk to N.O. about what had happened to H.E., and she did not fabricate the story about the Defendant to avoid being in trouble for her internet communications with the boy.

On cross-examination, H.E. testified as follows: The Defendant was the primary disciplinarian in the home, although it was her mother who decided to ground H.E. for H.E.'s inappropriate internet communications.  H.E. and N.O. had a good relationship, but H.E. did not have a good relationship with the Defendant.  As the Defendant was walking out of the bathroom on January 13, H.E. pulled her panties and pants back up because she did not want her siblings to see her exposed.  After the Defendant shut the bathroom door behind him, she took off her pants and panties, put her pants back on to walk out of the bathroom, carried her panties to the laundry basket in her bedroom, and changed her clothes.  When the detectives later asked, she retrieved the panties from the laundry basket and gave them to the police.  She never made the statement to her paternal grandfather,

Ray Gene Elliott, II, "I'll get rid of you just like I got rid of my dad[.]" She saw Mr. Elliott after January 13, 2021, when he visited her brothers, but she did not talk to him.

Fifteen-year-old N.O. testified as follows: The Defendant, who had been her stepfather, stopped living at their home on the day that H.E. ran away when N.O. was twelve. N.O. recalled that one day when N.O. was in elementary or middle school, and N.O.'s mother was at work at Wendy's, the Defendant called N.O. into the bedroom he shared with N.O.'s mother and touched N.O. on "[her] vagina (sic)" over her clothes. During that same time, the Defendant "made [N.O.] touch his body." The Defendant stood behind N.O., pulled her hands behind her back, and made her touch his penis. The Defendant's clothes were on. When she tried to pull away, the Defendant tightened his grip on her hands. Afterward, the Defendant told her not to tell anyone.

N.O. never talked to H.E. about what had happened to N.O. or about what had happened to H.E. However, on the night that H.E. ran away from home, N.O. finally told her mother what the Defendant had done to N.O. N.O. was aware that H.E. was grounded on January 13, 2021, but N.O. was not in trouble at that time and was not fabricating her story.

On cross-examination, N.O. testified as follows: She could not remember Mr. Elliott's having babysat the children after the Defendant left their home. She and H.E. did not talk about H.E.'s or N.O.'s trial testimony. When the Defendant stood behind her and made her bring her arms behind her back to touch his penis, she felt "[s]omething hard" that felt "[l]ike skin." She did not tell a different story to the investigators, and her testimony at trial was the truth.

On redirect examination, N.O. testified that what happened to her occurred prior to the time that H.E. ran away. She remembered what the Defendant did to her because it frightened her, but she did not recall "every specific detail about that day[.]" She would not lie for H.E.

H.E. and N.O.'s mother, O.C.,[2] testified as follows: The Defendant was H.E.'s biological father but was not N.O.'s biological father. O.C. and the Defendant had a total of five children together: H.E. and four sons. O.C. did all the cleaning and the laundry. The Defendant worked for a company that had "peanut butter everywhere" and one of their sons had a peanut allergy. Therefore, it was critical that the Defendant's laundry be kept separate. She and the Defendant used the "Life 360" application, and the Defendant knew O.C.'s "whereabouts every second of the day."

---

[2] To preserve the minor victims' privacy, we refer to their mother by her initials.

On January 13, 2021, O.C., who was two weeks from the delivery date of their youngest son, left the house to run some errands. After she returned home, she and H.E., who had previously been in trouble for inappropriate internet communications, got into an argument because H.E. did not want to hand over her Chromebook. H.E. ran away that evening, and O.C. was frantic to find her. As O.C. was walking out the door to begin driving the neighborhood and to call 911 to report H.E. as a runaway, the Defendant said to O.C. that if anything happened to his daughter, he would "punch [O.C.] "in the f***ing face."

H.E. was found at a neighbor's house and returned home. When O.C. started to hug H.E., H.E. stopped her and told her that her father had "touched [her] inappropriately." H.E. was "shaky[,]" had a pale face, and appeared very frightened. The police would not allow O.C. and H.E. back in the house until a family detective responded, and the Defendant was removed from the home. The Defendant never again returned home.

Two days later, O.C. noticed that H.E. had not changed her clothes and asked H.E. if she was still wearing the same underwear. When H.E. responded that she was, she told H.E. to put the underwear in a bag, to tie the bag shut, and to bring the bag to her. O.C. then placed the bag inside her closet. At the time of H.E.'s forensic interview, O.C. informed the detectives about the underwear, and the detectives followed her home to retrieve it. O.C. and H.E. did not wear the same size and did not share underwear.

On cross-examination, O.C. testified as follows: Mr. Elliott babysat the boys after January 13, 2021, but not the girls. Mr. Elliott had waved to H.E. and N.O. when he saw them, but neither girl "want[ed] anything to do with him" because he repeatedly accused H.E. of being a liar. Before H.E. ran away, O.C. had disciplined H.E. for "[i]nappropriate talking with another 14-year-old boy that lived in South Carolina." She could not remember exactly what was said but recalled that it involved "[v]ery explicit sexual talking." She had taken H.E.'s Chromebook away for two weeks, but on January 13 learned that H.E. "somehow got the Chromebook back into her possession." She also learned from N.O. that H.E. had been using N.O.'s Chromebook. On January 13, she confronted H.E. about having the Chromebook. H.E. at first denied that it was in her possession but eventually handed it over. After H.E. put in the password, O.C. saw "more sexual conversations that w[ere] very inappropriate along with" a nude photograph of H.E.'s breasts.

The Defendant did not say anything about the inappropriate conversation and nude photograph on H.E.'s computer, but instead just "sat there with a blank face." She screamed at the Defendant to ask why he was not saying anything, and H.E, who was "in full panic" mode and "crying[,]" asked to be allowed to talk to the Defendant alone. She refused to allow it, and "that's when everything started boiling up and [H.E.] . . . ran away."

Detective Caleb Shuford of the Knox County Sheriff's Office ("KCSO") testified as follows: On January 13, 2021, when he was assigned to patrol, he and his partner, Officer Sharp, responded to a house in Knox County on a report of a missing juvenile. They located H.E. inside the residence and returned her to her home. H.E. appeared upset and hesitant about going home, and when he asked her why she ran away, she told him that "she was scared." When H.E. and her mother were reunited, H.E. was "hysterical, crying and upset." H.E.'s mother kept telling H.E. that she was sorry, and H.E. said, "No, Mom, you don't have to be sorry. Daddy hurt me." Upon H.E.'s disclosure of sexual abuse, Officer Sharp contacted "the Family Crimes Unit[,]" and Detective Hummel responded to the scene. Detective Shuford identified his body camera video recording of that night, which was admitted as an exhibit and published to the jury.

Amy Heinrich, a former forensic interviewer for "Child Help," who conducted the forensic interviews of H.E. and N.O., described the forensic interview process and testified on direct and cross-examination as follows: H.E. and N.O. each made a disclosure of sexual abuse during their separate forensic interviews. Her job as a forensic interviewer was to provide "a safe space for a child to talk about what has happened to them"; she did not make any determinations as to the truthfulness of the child.

Tiffany Crawford of the KCSO's Forensic Unit identified the panties that she collected into evidence on January 20, 2021, which she submitted to the Tennessee Bureau of Investigation ("TBI"), along with the buccal swabs obtained from the Defendant and H.E.

Nina Hummell, who was a detective with the KCSO Family Crimes Unit in January 2021, testified on direct and cross-examination as follows: She was the on-call detective and responded with the Department of Children's Services ("DCS") to the victims' home early on the morning of January 14, 2021, where they conducted "a safety interview" with the victims to determine if there was a reason to proceed further with the investigation and if the victims would be safe. Their determination was that the victims were not safe with the Defendant, and DCS developed the "safety plan" that the Defendant "was not to remain in the home." H.E.'s demeanor at that time was "scared," appearing as if she wanted to talk "but was hesitant on . . . how to approach the subject." Detective Hummell observed the victims' forensic interviews, in which each child made a disclosure of sexual abuse. At some point during the interviews, she was made aware that H.E.'s mother had possession of the underwear that H.E. had been wearing during the most recent episode of sexual abuse. Upon the completion of the forensic interviews, Detective Hummell went to the victims' residence and had the underwear collected into evidence.

TBI Special Agent Forensic Scientist Terra Asbury, an expert in forensic biology, testified as follows: She tested the inside front waistband and crotch area of the panties for touch DNA and found the DNA of two individuals. The major contributor was H.E., and the minor contributor was the Defendant. There was no indication of a third person. Given that the amount of male DNA was "pretty significant[,]" she did not "find it likely that it came from [clothing] comingling in the laundry." In her opinion, it was "highly likely" that the Defendant's DNA resulted from "prolonged contact with [H.E.'s] underwear" and "unlikely" that it came from "just a casual touch."

The Defendant's father, Ray Gene Elliott, II, testified on the Defendant's behalf as follows: He babysat the children before and after January 13, 2021. A couple of months after January 13, 2021, H.E. and N.O. told him during an argument that they would get rid of him "like they got rid of [the Defendant.]" He continued to have a relationship with the victims, but he no longer babysat the children unless his fiancée was also present. He had never harmed them, but he feared that H.E. and N.O. "might say something about [him] and put [him] in this spot." He identified a photograph of himself, his fiancée, and other family members with H.E., which he said was taken on July 4, 2022.

On cross-examination, he testified as follows: He never told H.E. that he was going to walk away from the entire family if H.E. did not come to court and say that she had lied. He asked N.O. if her daddy had ever touched her, and N.O. said "no." He understood that the Defendant was not N.O.'s father, but N.O. called the Defendant "dad." He told H.E. and N.O. that he did not believe they were telling the truth about the Defendant. His fiancée was present when N.O. and H.E. made the threat that they would get rid of him like they got rid of the Defendant. He knew at the time that the girls made that statement that an investigation was ongoing, but he never informed law enforcement or DCS and did not mention anything about it until October 2022. He did not mention N.O.'s disavowal of having been touched by the Defendant to law enforcement because he did not know that the Defendant had been charged with touching N.O. He would not lie for the Defendant.

After deliberations, the jury convicted the Defendant of all counts as charged. At the conclusion of a sentencing hearing, the trial court merged the statutory rape by an authority figure counts into the rape counts and sentenced the Defendant to an effective term of thirty years at 100% in the Tennessee Department of Correction. Following the denial of his motion for new trial, the Defendant filed a timely appeal to this court.

## ANALYSIS

The sole issue the Defendant raises on appeal is whether the evidence is sufficient to sustain his convictions. Specifically, the Defendant argues that the victims were not credible in their testimony, asserting that "[n]o reasonable person could conclude that the

proof" was sufficient to establish any of the offenses beyond a reasonable doubt when the victims "waited to voice these allegations of sexual abuse until immediately after H.E. was caught sending sexually-inappropriate emails and images to her boyfriend[.]" The State points out that credibility determinations are within the province of the jury, and argues that H.E. and N.O.'s testimony established every element of each offense, thereby providing a basis for the jury to find the Defendant guilty of the offenses beyond a reasonable doubt. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When viewed in the light most favorable to the State, the evidence was sufficient to sustain the convictions. The victims' respective testimony satisfied the elements of each offense, and H.E.'s testimony about the bathroom sexual assault was corroborated, in part, by the presence of the Defendant's DNA on H.E.'s panties. The jury heard extensive testimony that H.E.'s initial disclosure of sexual abuse occurred on the heels of her having been disciplined for her sexually explicit internet communications, and the Defendant argued strenuously in closing that the victims were "two devils of deception" who lied to get rid of the Defendant and so that H.E. could escape the consequences of her bad

behavior. The jury also heard testimony about H.E.'s demeanor at the time of her initial disclosure and was able to watch the officer's body camera video recording of H.E. being returned from the neighbor's house to her mother. By finding the Defendant guilty of the offenses beyond a reasonable doubt, the jury obviously found H.E. and N.O. credible in their testimony. This was within the jury's prerogative as the trier of fact. We, therefore, affirm the Defendant's convictions.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

s/ JOHN W. CAMPBELL

JOHN W. CAMPBELL, SR., JUDGE
